**Karen L. BLAINE, Plaintiff,**

v.

**The INDUSTRIAL COMMISSION OF UTAH, Panelera Corporation, State Insurance Fund, and Second Injury Fund, Defendants.**

**No. 19432.**

Supreme Court of Utah.

April 19, 1985.

Robert J. Shaughnessy, Salt Lake City, for appellant.

Fred R. Silvester, Salt Lake City, for Panelera Corp. and State Ins. Fund.

Gilbert A. Martinez, Salt Lake City, for Second Injury Fund.

HALL, Chief Justice:

Plaintiff Karen L. Blaine seeks review of an order of the Industrial Commission denying her compensation benefits on the ground that her medical treatment subsequent to April 1982 was not reasonably related to her industrial injury.

In October 1979, while working as a truck driver for Panelera Corporation, Blaine was accidentally struck in the head by a truck door. Thereafter, she suffered severe headaches, pain in her neck, shoulders, and back, and blurred vision. She was diagnosed as suffering from a mild concussion and a cervical strain, and various pain relievers were prescribed. Her condition persisted, and she was admitted to the hospital for additional treatment in November 1979. Upon her discharge in December 1979, she returned to work. However, her condition flared up intermittently, and she was hospitalized numerous times. After one such hospitalization in May 1980, she did not return to work.

In October 1980, the State Insurance Fund (Fund) denied further benefits to Blaine. She was examined by a medical panel. In reporting its diagnosis, the panel stated:

> As a result of the industrial injury, Mrs. Blaine suffered contusions of the face, a mild concussion and a cervical sprain. She recovered from all of these with no permanent impairment in six to eight weeks.
>
> . . . .
>
> At the present time, this lady is suffering from a clinical depression and from a psychophysiologic reaction involving the neck and right upper extremity. She also has a problem of drug dependence.
>
> As far as the relationship of this psychological disorder to the accident is concerned, it should be noted that she had many manifestations of this prior to the injury.
>
> . . . .
>
> Despite the presence of these psychological problems prior to the accident, she was functioning and was certainly not as impaired psychiatrically as she is at the present time.
>
> Therefore, it was the opinion of the panel that she has a psychoneurosis manifested by depressive reaction and psychophysiological reaction as well as drug dependency.

The panel found that before the accident Blaine had a disability of 13 percent, 10 percent of which was attributable to psychiatric problems and 3 percent of which was the result of a cervical fusion she had had in 1969 after an automobile accident. After the industrial accident, the panel found Blaine had a temporary total disability until May 1980. Thereafter, she had a permanent partial disability of 22 percent, 13 percent of which was preexisting and 9 percent of which was accident-related. Further, the panel found the only future medical treatment reasonably required as a result of the accident would be treatment at a pain clinic to reduce Blaine's drug dependency.

In October 1981, after a hearing, the Commission adopted the findings of the medical panel and ordered compensation to Blaine accordingly.

From October 1981 to April 1982, Blaine received treatment at the pain clinic at the University of Utah Medical Center. She was hospitalized twice during that time. In August 1982, she moved to Nevada. Beginning in November 1982, she was treated several times for severe headaches at a hospital emergency room. After a suicide attempt, she was admitted to the hospital for treatment and was readmitted several times thereafter.

Blaine claimed workers' compensation benefits for the treatment she received after the Commission's order in October 1981. The Fund denied liability. Blaine

was again examined by a medical panel. Additional medical records were submitted to the panel showing that in 1975–76 Blaine had been hospitalized for neck pain and headaches after a 1975 automobile accident. Blaine had previously denied having had headaches before the industrial accident. The panel concluded that "it had no reason to change the opinions expressed [in the prior medical panel report]," that Blaine had been temporarily totally disabled as a result of the industrial accident during her two hospital admissions while a patient at the pain clinic, and that "[o]f the medical treatment received by the applicant since October 5th, 1981, the treatment at the Pain Clinic at the University of Utah, as recommended by the panel, would be considered reasonably necessitated by the residual effects of her industrial accident."

Blaine objected to the medical panel report, and one of her personal physicians, Dr. Richard Goka, testified at a hearing that as a result of the accident Blaine had suffered a cervical strain, that he diagnosed her as having cervical fibrositis or myofacial syndrome aggravated by stress, that she was "somewhat resistant to treatment" because of a preexisting personality disorder, and that the industrial accident was a contributing factor to her condition, which could persist the rest of her life. He testified that he could "never" attribute her condition entirely to her personality disorder, that fibrositis may be precipitated by trauma, and that, not having examined Blaine before the industrial accident, he could not say whether her fibrositis existed before the accident.

A member of the medical panel also testified. He stated that there was no significant difference in the diagnoses of the panel and Dr. Goka, but that there was no recommended treatment for fibrositis and that the panel "feels ... [Blaine's] present state is not due to the specific accident of October 12, 1979, but was clearly a progression of a pre-existing condition which is well documented in the medical records back before 1970."

The Commission adopted the findings of the medical panel and denied Blaine benefits for treatment after April 1982.

Blaine contends that the Commission's denial of benefits following her discharge from the pain clinic in April 1982 was arbitrary and capricious because it was unsupported by the evidence.

This Court's standard of review of the Commission's record is set forth in U.C.A., 1953, § 35–1–84, which provides that the Court may affirm or set aside an order of the Commission only upon the following grounds:

(1) That the commission acted without or in excess of its powers;

(2) That the findings of fact do not support the award.

 This Court has interpreted the foregoing statutory standard on numerous occasions and has concluded that the Commission's findings are not to be displaced in the absence of a showing that they are arbitrary and capricious.[1]

In *Martinson v. W–M Insurance Agency*,[2] the Court defined the appropriate standard of review in the following manner:

When the Commission remains unpersuaded on a question of fact, this Court does not disagree therewith and compel such a finding unless the evidence is such that all reasonable minds would so find, and the court would thus so rule as a matter of law. On the contrary, if there is a reasonable basis in the evidence (or lack of evidence) such that reasonable minds acting fairly thereon could remain unpersuaded, this Court does not upset the determination made.[3]

 Application of the foregoing standard of review requires affirmance of the Commission's order. Although some dis-

---

1. *Ogden Standard Examiner v. Industrial Comm'n,* Utah, 663 P.2d 88 (1983); *Kincheloe v. Coca Cola Bottling Co.,* Utah, 656 P.2d 440, 443 (1982); *Kaiser Steel Corp. v. Monfredi,* Utah, 631 P.2d 888, 889 (1981).

2. Utah, 606 P.2d 256 (1980).

3. *Id.* at 258–59 (citations omitted).

pute exists in the medical evidence, the record adequately supports the Commission's factual determinations.

The medical records reveal that Blaine was hospitalized and extensively treated for headaches a number of times prior to her 1979 industrial injury. She also suffered injuries in three separate automobile accidents. The first, in 1967, resulted in a whiplash injury, and she ultimately submitted to a fusion of her cervical spine; the second, in 1975, caused her to complain of resultant neck pain; and the third, in 1976, caused her to be hospitalized for severe headaches. The attending physician at that time was of the opinion that she was "greatly overmagnifying her problem" and that she had tension headaches and possibly a drug addiction and an anxiety state.

Upon her admission to Washoe Medical Center on March 18, 1976, Dr. Maher observed, "It is apparent on reading through this lady's hospital records, that a major component of her problem is her psychiatric illness which has never been fully worked up and treated."

On April 15, 1976, Dr. Haislip, in a discharge summary from the Washoe Medical Center, noted, "A review of this patient's previous admissions to this hospital, which have been multiple, in most cases the consensus of opinion of many different doctors, are [sic] that this patient's problems are primarily on the psychiatric basis, with a combination of anxiety and depression."

It thus appears that Blaine suffered from headaches over a period of years prior to the industrial injury she sustained in 1979. Also, a number of medical opinions following the 1979 injury support the Commission's conclusion that her complaints stem not from the industrial injury, but from psychological problems.

Blaine's initial physical therapy evaluation was conducted on October 12, 1981, at the University of Utah Pain Clinic, at which time the therapist observed, "It appears that there is quite a dependency on the medical system, and a very strained relationship at home and all of this is playing into this pain problem so it appears there is going to be a large behavioral component." The therapist also noted that there were no real neurological symptoms and that "[a] large part of her therapy is going to come from the behavioral end and her recognizing and dealing with many of the *outside factors keeping her in this position of pain.*" (Emphasis added.)

Dr. Steve Sanders, a psychiatrist at the University of Utah Pain Clinic, also performed an evaluation of the plaintiff. He noted her suicidal tendencies and associated her pain symptoms with stress caused by the death of her father some years previously, the illness of her mother, and strained conditions at home. He also noted a history of low pain tolerance.

Her pain clinic discharge summary by Dr. Mark Rindflesh indicated that her headaches were caused by psychological problems and not by the industrial accident:

Unfortunately Mrs. Blaine has a number of significant psychological problems that were not fully resolved during [her hospitalization in 1981]. *The chaos in her day to day life that stem[s] from relationships with her mother and husband have led to her headaches becoming once again quite severe* and have also led to the onset of G.I. disturbances.

(Emphasis added.) Dr. Rindflesh's prognosis noted, "She has a longstanding history of overreaction to stress and has a tendency to minimize the effects stress has upon her."

There is a reasonable basis in the evidence for the conclusion reached by the Commission that no further medical or surgical treatment is reasonably necessary as a result of the industrial injury. Consequently, we do not disturb that determination.

Affirmed.

STEWART, HOWE, DURHAM and ZIMMERMAN, JJ., concur.